UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

    Plaintiff,

v.

Jason Bo-Alan Beckman (01),

    Defendant.

**MEMORANDUM OPINION AND ORDER**
Crim. No. 11-228

_____

    David J. MacLaughlin and Tracy L. Perzel, Assistant United States Attorney, Counsel for Plaintiff.

    Douglas B. Altman, Counsel for Defendant Jason Bo-Alan Beckman.

    W. Anders Folk, Leonard, Street and Deinard, Counsel for Willkie Farr & Gallagher, LLP and Martin Klotz.

    Richard G. Mark and Matthew G. Forsgren, Briggs and Morgan, P.A., Counsel for Briggs and Morgan, P.A.

_____

    Before the Court are motions to quash brought by the law firms of Willkie Farr & Gallagher, LLP ("Willkie") and Martin Klotz [Doc. No. 223], and Briggs and Morgan, P.A. ("Briggs"). [Doc. No. 230] and Defendant Beckman's motion to exclude evidence of attorney-client communications. [Doc. No. 220].

1

I.  **Background**

The government issued subpoenas to three law firms that provided legal representation to Defendant Beckman and/or certain Oxford entities. The subpoenas seek documents and testimony concerning the firms' representation concerning "Mr. Beckman's bid to the NHL to become a minority owner of the Minnesota Wild; and [] all documents relating to the foreign currency investment program which Mr. Beckman purported to run and in which he had a purported investment." (Affidavit of Martin Klotz, Ex. 3; Declaration of Richard Mark, Ex. A.) Two of the law firms served a subpoena, Willkie and Briggs, have moved to quash.

Beckman moves to exclude any testimony or documents that result from the issuance of these subpoenas on the basis that such evidence is subject to attorney-client privilege.

A.  **Willkie Farr & Gallagher, Martin Klotz Motion to Quash**

In its motion to quash, Willkie asserts that it was retained to represent Oxford Global Advisors, LLC ("OGA") in July 2008. (Klotz Aff., ¶ 2, Exs. 1 and 2.) The engagement letter specifically provides "[t]his engagement does not create an attorney-client relationship with any persons or entities related to

[OGA] such as parents, subsidiaries, affiliates, employees, officers, directors, shareholders or partners." (Id., Ex. 1.)

Willkie asserts it possesses documents responsive to the subpoena consisting of communications between Willkie and Beckman, as principal of OGA, that would be protected by the attorney-client privilege. Willkie acknowledges that OGA has been placed in a receivership and that the Receiver has waived the attorney-client privilege with respect to OGA. (Id. ¶ 6; (Doc. No. 187) Ex. B (E-mail from R.J. Zayed, Court Appointed Receiver in Civil Nos. 09-3332, 09-3333, and 11-574 in which he waived the attorney-client privilege the Receiver Estates have with Willkie, Morgan Lewis and Briggs).) Because Beckman has objected to Willkie providing documents or testimony on the grounds that the Receiver lacks the authority to waive privilege on behalf of OGA or because notwithstanding such waiver Beckman asserts a personal privilege relating to the documents and testimony sought, Willkie Farr moves to quash the subpoena.

Beckman argues that the communications sought by the government concern attorney client communications through which Beckman sought legal advice as an individual for personal and business reasons. He asserts that

eventually, the business interests included some of the Oxford entities. Beckman asserts he will provide an *ex parte* affidavit, identifying each occasion during which he communicated with counsel without a third party present. Beckman asserts privilege over all notes, memoranda, recordings, correspondence, or other record concerning these communications. Because the communications concern legal advice given to Beckman as an individual, he is not waiving the privilege.

Beckman further asserts that the entities over which the Receiver has control sought little or no legal advice on behalf of the entity, or sought legal advice that is separable from Beckman's personal interests. Beckman asserts, on information and belief, that the Oxford entities did not make any formal corporate decisions to employ any of the lawyers for purposes of seeking legal advice. Further, Beckman asserts that he never intended to disclose any confidential communications he had with his lawyers, nor did he intend to authorize the Receiver to disclose any of his privileged communications. See Federal Rules of Evidence, 502(b) ("Inadvertent Disclosure. When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if: (1) the disclosure was inadvertent.")

The government asserts that there is clear evidence that Willkie was retained to represent only OGA.  Further, the Receiver has validly waived the attorney-client privilege on behalf of OGA.  Therefore, Willkie's motion to quash should be denied as any privilege concerning communications between Willkie, Martin Klotz and Beckman have been waived.

In response to a prior motion brought by Beckman, this Court held that an email from Martin Klotz, a Willkie attorney, to Beckman, in which he stated that the currency program was "riddled with irregularities" could be introduced at trial as the attorney-client privilege as to such document had been waived.  Evidence of waiver included the fact that Beckman forwarded the email to Chris Pettengill, who thereafter turned over the email to the government.  See PaineWebber Group, Inc. v. Zinsmeyer Trusts Partnership, 187 F.3d 988, 992 (8th Cir. 1999) (attorney-client privilege is waived by the voluntary disclosure of privileged communication).

Further, this Court appointed a Receiver over OGA, one of many Receiver Estates, and pursuant to Court Order, the Receiver has been given the authority to take any action which could be taken by the officers, directors, partners, members and trustees of OGA, including the authority to waive any attorney-

client privilege of OGA.  (See SEC v. Cook, Civ. No. 09-3333 (Doc. No. 68); CFTC v. Cook, Civ. No. 09-3332 (Doc. No. 96); SEC v. Beckman, Civ. No. 11-574 (Doc. No. 10).)  The Receiver also has the authority to retrospectively waive the attorney/client privilege over the objections of the former principles.  CFTC v. Weintraub, 471 U.S. 343 (1985) (finding that bankruptcy trustee can waive attorney/client privilege with respect to a pre-bankruptcy attorney/client communication as to which the former management objected).  See also SEC v. Ryan, 747 F. Supp. 2d 355, 367-68 (N.D.N.Y. 2010).

As noted above, the Receiver has waived any attorney-client privilege that OGA has with Willkie.  As Willkie was retained to provide legal representation only to OGA, there is no privilege that prevents Willkie from responding to the government subpoena.  Accordingly, Willkie's motion to quash is denied.  To the extent that Beckman moves to exclude any evidence from Willkie and attorney Klotz, such motion is denied.

    **B.**    **Briggs and Morgan Motion to Quash**

Briggs began representing Beckman and the Oxford entities in February 2008.  (Mark Decl. ¶ 2.)  Briggs' representation of the Oxford entities ended in May 2008.  (Id. ¶ 3.)  Beckman remained a client of Briggs until July 2009.  (Id. ¶

4.)

It is Briggs' position that the subpoenaed documents are covered by attorney-client privilege, and that Beckman is asserting privilege as to any communications between Briggs and Beckman as an individual, and disputes the Receiver's waiver on behalf of the Receiver entities. The government responds that the crime-fraud exception to the attorney client privilege applies as to Briggs. Briggs takes no position on the applicability of the crime-fraud exception to the subpoenaed documents.

  1.   **Crime Fraud Exception**

The crime-fraud exception to the attorney-client privilege applies to "communications 'made for the purpose of getting advice for the commission of a fraud' or crime." United States v. Zolin, 491 U.S. 554, 563 (1989). Before this exception can be applied, there must be a prima facie showing that the legal advice was obtained in furtherance of an illegal or fraudulent scheme. In re Green Grand Jury Proceedings, 492 F.3d 976, 982 (8th Cir. 2007). The exception does not apply "with respect to past wrongdoings but rather to further a continuing or contemplated criminal fraud or scheme." Id. at 979. The crime-fraud exception also applies to attorney work product that is generated by

counsel in furtherance of the client's misconduct. Id. at 980.

To set forth a prima facie showing of the criminal-fraud exception, the requesting party is required to put forth a factual basis adequate to support a good faith belief by a reasonable person that the legal advice was obtained in furtherance of a fraud or illegal activity. Id. at 982. This threshold need not be a stringent one. Zolin, 491 U.S. at 572. In determining whether a prima facie showing has been made, the Court may review any relevant evidence that was lawfully obtained that has not been adjudicated to be privileged. Id. at 575.

If the Court determines that a prima facie showing has been made, the Court may use its discretion in determining whether to engage in an *in camera* review.

> The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through in camera review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply. The district court is also free to defer its in camera review if it concludes that additional evidence in support of the crime-fraud exception may be available that is not allegedly privileged, and that production of the additional evidence will not unduly disrupt or delay the proceedings.

Id.

A higher burden of proof is required to overcome the privilege than for an *in camera* review. Id.

Beckman asserts the government has alleged schemes to defraud between 2005 and November 2009. The law firms and lawyers to which the government served subpoenas did not begin to represent Beckman until January 2008, and much of the communications which involved Beckman seeking and receiving legal advice took place in the summer of 2008. Beckman asserts that even assuming some of the subject matter for which legal advice was sought and given involved activity relevant to the government's allegations, those communications relating to subject matter between 2005 and at least the summer of 2008 cannot be subject to the crime-fraud exception because any relevant communications would have involved discussions of past conduct.

The government asserts that the crime-fraud exception applies to any attorney-client privilege as to Briggs. In support, the government has submitted affidavits from Joel Barth and John Tschida.

Mr. Barth is a principal with EisnerAmper LLP, a full-service accounting and advisory firm, and he has been engaged by the NHL to perform financial due diligence on persons who apply to acquire ownership in NHL teams. (Barth

Aff. ¶ 2.) He performed the financial due diligence on Mr. Beckman. (Id. ¶ 3.) To the extent that Beckman provided Barth with financial information about himself, Barth states that in most cases, the information was provided through Briggs' attorneys. (Id. ¶ 4.)

Barth then discusses the information he received on Beckman's finances, and the issues that arose as to the accurateness of the information. For example, Beckman forwarded a draft Statement of Financial Condition of Jason and Hollie Beckman which reflected a net worth of $21,685,000. (Id., Ex. 1.) This draft provided that most of Beckman's net worth derived from an investment in Universal Brokerage FX and Oxford Group. (Id. ¶ 6.) Attached to the draft were account statements from "The Oxford" reflecting a balance of $2,842,340.62. Barth asserts the account statement did not appear to be the product of a legitimate financial institution. (Id. ¶ 7.) This prompted Barth to inquire of Beckman and his staff of the statement's origin. (Id.)

Briggs also reported to Barth that Beckman was the 96% owner of the Oxford Group and provided him a balance sheet indicating that it had "Member's Equity" as of October 31, 2008 of $21,653,905. (Id. ¶ 8.) Of this amount, $11,830,430 represented cash, $6,870,466 in investments and $2,714,182

in book value. (Id., Ex. 2.) Barth investigated the nature and legitimacy of these assets.

Through his investigation, Barth discovered that the information provided him raised a number of flags. For example, Barth researched the status of Crown Forex, SA and readily discovered that it was financially distressed and its assets frozen by FINMA. (Id. ¶ 10.) Beckman then arranged for Barth, through Briggs, to speak with Shadi Swais, who assured Barth that Crown Forex had no serious financial problems. (Id.) Barth personally corresponded with FINMA regulators, however, who told him the assets of Crown Forex were, in fact, frozen. (Id.)

Another example concerns Beckman's representation that the Oxford Group had a $6,209,909.32 investment in PFG. Again, through Briggs, Barth was provided documentation and links to online accounts. Barth then states "After my independent discovery of the worthlessness of PFG account FC364 and its associated subaccounts, Mr. Beckman withdrew his contention that he had an asset at PFG of any value." (Id. ¶ 12.)

John Tschida is a Special Agent with the IRS Criminal Investigation Division. (Tschida Aff., ¶ 1.) He has reviewed the materials provided to the United States by the NHL, the Minnesota Hockey Ventures Group and

EisnerAmper LLP and has participated in interviews of David Zimmerman, General Counsel to the NHL and Joel Barth of EisnerAmper.  Both Zimmerman and Barth reported to Tschida that they received substantially all materials to evaluate Beckman's application through Briggs.  (Id. ¶ 2.)

Tschida details in his affidavit numerous instances in which Beckman, through Briggs, provided misleading information, or concealed requested information, concerning his application to buy a minority interest in the Wild.  For example, the application from the NHL requested that Beckman provide his entire litigation history, but he failed to do so.  (Id. ¶¶ 4 and 5.)  Beckman also failed to report the five NASD disciplinary actions in which he was named.  (Id. ¶ 7.)  Tschida also asserts that based on the investigation he has conducted, he knows that Beckman's reported net worth to the NHL is false, and describes the evidence supporting this assertion.

Based on the above, the Court finds that the government has put forth sufficient evidence of a prima facie showing that the criminal-fraud exception applies to any communications between Beckman and the Briggs firm.  Accordingly, the Court will conduct an *in camera* review of all responsive documents to the Briggs subpoena.

**IT IS HEREBY ORDERED:**

1. Willkie Farr & Gallagher LLP's and Martin Klotz's Motion to Quash Subpoena [Doc. No. 223] is DENIED;

2. Briggs and Morgan, P.A.'s Motion to Quash [Doc. No. 230] is RESERVED.  Briggs shall serve all responsive documents to the subpoena to the Court for *in camera* review on or before noon, April 18, 2012;

3. Defendant Beckman's Motion to Exclude Evidence of Attorney-Client Privilege [Doc. No. 220] is DENIED as to Martin Klotz and Willkie Farr & Gallagher and RESERVED as to Briggs and Morgan, P.A.  Defendant shall submit an *ex parte* order to the Court concerning his relationship with Briggs and Morgan, P.A. on or before noon, April 18, 2012.

Date:   April 18, 2012

                                      s/ Michael J. Davis
                                      Michael J. Davis
                                      Chief Judge
                                      United States District Court