UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

       Plaintiff/Respondent,

                               **MEMORANDUM OPINION**
                                **AND ORDER**

v.                               Crim. No. 11-228 (01) (MJD)

Jason Bo-Alan Beckman,

       Defendant/Petitioner.

_____

       David J. MacLaughlin and Tracy L. Perzel, Assistant United States Attorneys, Counsel for Respondent.

       Petitioner, *pro se*.

_____

       This matter is before the Court upon Petitioner Jason Bo-Alan Beckman's Motion to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255 and motion to appoint counsel.

## I.    Introduction

       Following an eight week trial, Petitioner was found guilty of multiple counts of wire fraud, mail fraud, money laundering, conspiracy to commit wire and mail fraud, filing false tax returns and tax evasion.  These convictions arose

from a Ponzi scheme that operated between July 2006 and July 2009, in which

Petitioner and others received over $193 million from hundreds of investors.

The evidence presented at trial overwhelmingly demonstrated that

Petitioner and his co-conspirators defrauded victims by convincing them to

invest their money in a sham currency program that they falsely claimed would

earn a 10 to 12 percent return.  They also told investors their investments were

held in segregated accounts and that the investment was risk-free and completely

safe.  Petitioner, through his firm Oxford Private Client Group ("OPCG"),

solicited investors to invest in the fraudulent currency scheme.  Petitioner also

falsely inflated his own credentials to potential investors by claiming he was a

top-ranked portfolio manager pursuant to a Morningstar comparative study; a

study and ranking that did not exist.

Petitioner claims that Trevor Cook was the master-mind of the fraudulent

scheme and that he was not aware of the true nature of the scheme until the

Phillips lawsuit was filed in July 2009[1].  Substantial evidence was presented at

trial, however, to contradict this claim.  For example, evidence was presented to

show that beginning in May 2008, Petitioner was repeatedly told by legal counsel

---

[1]Phillips et al. v. Trevor Cook et al., 09-1732 (MJD) (D. Minn.)

hired to assist his attempt to purchase an interest in an NHL team, that the

currency program was illegal, and that he should return the investment funds to

the currency program victims and to cease doing business with Trevor Cook.

Petitioner did not heed counsel's advice.  Not only did Petitioner continue to do

business with Cook, he continued to accept investor funds and place them in the

fraudulent currency scheme or use them for his own purposes.

Substantial evidence was also presented at trial regarding Petitioner's

scheme to defraud the NHL in order to obtain an ownership interest in an NHL

team.  To become an owner of an NHL team, Petitioner had to demonstrate that

he had a substantial net worth.  To demonstrate his net worth, Petitioner hired

the law firm of Briggs and Morgan, and through this firm, Petitioner made a

number of fraudulent financial disclosures related to the fraudulent currency

scheme.  The individual hired to evaluate the financial information provided by

Petitioner, Joel Barth, eventually determined that virtually all of the information

Petitioner provided regarding his net worth was fraudulent and not supported

by proper documentation.

Substantial evidence was also presented at trial to show that Petitioner

stole millions from the Quiggle family trust and from elderly clients Raymond

and Charlotte Olson.  Charlotte Olson's father had established the Arthur W.

Quiggle Family Trust for the benefit of his children and grandchildren ("Quiggle

Trust") and Charlotte Olson established her own trust for the benefit of her

children ("Olson Trust").

In 1998, Charlotte Olson suffered a stroke and thereafter became

dependent on others for investment advice.  In 2002, Petitioner became her

financial advisor.  In 2007, without authorization from the trustees, Petitioner

caused the Quiggle Trust to sell more than $3 million in old, blue-chip stocks, and

invested the money with Cook.  Then in 2008, Petitioner caused $3.7 million of

stocks in the Quiggle Trust to be pledged to the Union Bank of Switzerland to

secure a loan, the proceeds of which were diverted to the currency program.  At

the time this transfer took place, Petitioner had already been advised by legal

counsel the currency program was illegal.

Petitioner also stole money from Charlotte Olson and the Olson Trust - $5

million - and directed it to Cook.  Most of the money was obtained when

Petitioner coordinated the viatical sale of two life insurance policies that were

owned by the Olson Trust and which insured Raymond Olson's life, and then

diverted the proceeds from the sale of those policies to pay margin calls in

Petitioner's PFG currency trading account.

## II.    Post Conviction

Prior to his sentencing, the United States Probation Office prepared a Presentence Investigation Report ("PSR") advising that the total offense level for the crimes of conviction was 43 and that his criminal history category was I.  The Court calculated the applicable guideline range based on the statutory maximum for each count of conviction as follows: Counts 1 to 17 - 20 years; Counts 20 and 21 - 10 years; Counts 27 and 31 - 3 years; and Count 29 - 5 years.  But for the statutory maximum sentences for the crimes of conviction, the advisory guideline range would have been life in prison.

On January 3, 2013, the Petitioner was sentenced to a total term of imprisonment of 360 months: 240 months on Counts 1 through 17, 120 months on Counts 20 and 21, 36 months on Counts 27 and 31 and 60 months on Count 29; the sentences for Count 1 through 17 were ordered to be served consecutive to the terms on Counts 20 and 21, but concurrent with the terms on Counts 27, 29 and 31.

Petitioner's conviction and sentence were affirmed on appeal.  United States v. Beckman et al., 787 F.3d 466 (8th Cir. 2015) reh'g denied (Jun. 17, 2015).

On October 3, 2016, Petitioner filed the instant habeas petition in which he asserts a variety of claims, including numerous ineffective assistance of counsel claims. Petitioner has also moved for appointment of counsel to assist with this habeas petition. For the reasons stated below, Petitioner's motions will be denied.

### III. Standard of Review

Under 28 U.S.C. § 2255, "[a] prisoner in custody under sentence . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence . . . or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Section 2255 is intended to provide federal prisoners a remedy for jurisdictional or constitutional errors. Sun Bear v. United States, 644 F.3d 700, 704 (8th Cir. 2011). It is not intended to be a substitute for appeal or to relitigate matters decided on appeal. See Bousley v. United States, 523 U.S. 614, 621 (1998); Davis v. United States, 417 U.S. 333, 346-47 (1974)).

Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice. A movant may not raise constitutional issues for the first time on collateral review without establishing both cause for the procedural default and actual prejudice resulting from the error.

United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996) (citations omitted).

The Petitioner is entitled to an evidentiary hearing on his petition "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C.A. § 2255(b). "[A] petition can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." Engelen v. United States, 68 F.3d 238, 240 (8th Cir. 1995) (internal citations omitted).

The Court finds that Petitioner has not demonstrated that he is entitled to an evidentiary hearing. Many of the allegations asserted in the petition are contradicted by the record, and for the remaining allegations, even if accepted as true, Petitioner has not demonstrated that he is entitled to relief.

## IV.   Merits Determination

### A.   Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel may constitute both cause and

prejudice to excuse a procedural default.  Boysiewick v. Schriro, 179 F.3d 616, 619

(8th Cir. 1999) (citation omitted).  Such claims must be scrutinized under the two-

part test of Strickland v. Washington, 466 U.S. 668 (1984).  Under the Strickland

test, Petitioner must prove that: 1) counsel's representation was deficient; and 2)

counsel's deficient performance prejudiced Petitioner's case.  Kingsberry v.

United States, 202 F.3d 1030, 1032 (8th Cir. 2000) reh'g and reh'g en banc denied,

(March 28, 2000).

To satisfy the first prong of the Strickland test, Petitioner must show that

counsel's representation fell below an objective standard of reasonableness under

professional norms.  Strickland, 466 U.S. at 688.  The inquiry should be whether

counsel's assistance was reasonable considering all of the circumstances

surrounding the case.  Id.  Judicial scrutiny of counsel's performance should be

highly deferential and the general presumption is that counsel's conduct "falls

within the wide range of reasonable professional assistance."  Id. at 689.

To satisfy the second prong under the Strickland test, Petitioner must show

that but for counsel's errors, the outcome of the proceedings would have been different. <u>Id.</u> at 691. The analysis may begin with the second prong and if Petitioner fails to show actual prejudice, the Court need not consider the reasonableness of counsel's behavior. <u>Id.</u>

Petitioner claims that defense counsel was ineffective in a number of ways. After reviewing the submissions of the parties, and the files and proceedings herein, including the trial transcript, the Court finds that Petitioner has failed to show that but for counsel's errors, the outcome of the proceedings would have been different.

### 1.    Grounds 1 and 8 - Denied Counsel of Choice

Petitioner argues that although defense counsel was a seasoned criminal defense attorney, counsel had limited resources and had limited comprehension of new technologies as well as limited experience in the securities and financial industry. Petitioner has failed to demonstrate how this alleged lack of experience affected the outcome of the trial.

Petitioner further argues that counsel should have sought funds from an Error and Omissions Policy that Petitioner obtained as part of his business operations. Petitioner concedes, however, that such policy was frozen pursuant to

Court Order in a related civil action.  See SEC v. Beckman, Civ. No. 11-574 [Doc.

No. 9] (D. Minn. 2011).  In addition, Petitioner has failed to demonstrate that the

insurance proceeds were wrongly withheld from Petitioner, or that counsel was

ineffective because he failed to access such insurance proceeds.

Finally, Petitioner argues that counsel was only provided 45 days to

research, review and prepare his defense, but the record does not support this

argument.  Defense counsel was appointed on July 25, 2011 and trial did not

commence until April 19, 2012.  The government has submitted defense counsel's

billing records which demonstrate that counsel was able to devote a significant

amount of time preparing for trial.  (See Gov't Exs. B-K.)  In fact, the billing

records indicate that defense counsel billed a total 1,154 hours to Petitioner's

defense; 869.7 hours billed from the date of indictment to the conclusion of the

trial.  The Court thus finds that defense counsel devoted sufficient time to prepare

Petitioner's defense.

### 2.    Ground 2 - Speedy Trial Violation

Petitioner asserts he was denied due process when the Court granted the

government's motion for continuance, moving the trial date from the proposed

date of December 5, 2011 to April 19, 2012, and that he was denied effective

assistance of counsel when his attorney failed to object to the government's

request for a new trial date.

The Indictment was filed on July 18, 2011, a Superseding Indictment was

later filed on November 22, 2011, and a Second Superseding Indictment was filed

on February 22, 2012.  The government brought a motion for a trial certain date

and to exclude time under the Speedy Trial Act to continue the trial date as the

case was complex and involved more than 700 victims. [Doc. No. 121]  Although

Petitioner's counsel and co-defendant Durand's counsel originally opposed the

motion, they filed a memorandum in assent of the government's motion, agreeing

to a continuance on the basis that the government turn over Jencks material at

least 45 days prior to trial. [Doc. No. 125]

To determine whether Petitioner's Speedy Trial rights were violated, the

Court must balance the following factors:  (1) length of delay; (2) reason for the

delay; (3) defendant's assertion of the right; and (4) prejudice.  Barker v. Wingo,

407 U.S. 514, 530 (1972).  Applying these factors to the facts of this case, the Court

finds that Petitioner cannot demonstrate that the outcome of this proceeding

would have been different had counsel objected to the motion for continuance.

11

Petitioner was arrested on July 20, 2011, and his trial commenced on April 19, 2012. This Court granted the motion to continue based on the nature and complexity of the case, the loss amount and the number of victims involved and the number of potential witnesses. Given the complexity of the fraud scheme charged, a nine month period between arrest and trial is not presumptively prejudicial. Petitioner has thus failed to demonstrate he was denied effective assistance of counsel based on a violation of the Speedy Trial Act.

### 3.    Ground 3 - Counsel's Failure to Submit Evidence

Petitioner next argues that additional evidence concerning the sale of shares of OPCG to two clients, Dale Woodbeck and Charlotte Olson, should have been submitted at trial to show that they knowingly purchased the shares on their own volition. Petitioner further claims that counsel did not submit evidence to show that Charlotte Olson was aware of the sale of two insurance policies in which the insured was Raymond Olson. Petitioner claims that this additional evidence, viewed in the aggregate, would have changed the outcome of the trial beyond a reasonable doubt.

During the government's case-in-chief, Dale Woodbeck testified that he did purchase shares in OPCG, and that after the fraud was discovered, Petitioner

agreed to give Woodbeck the money spent on such purchase. (Tr. III at 500, 541-42; Gov't Ex. 35.) Raymond Olson also testified at trial, and it was his testimony that Petitioner had talked with his wife about buying shares in OCPG for $25,000 each; one for herself, her daughter and a nephew, but that the purchase of shares never took place. (Tr. XIII at 3158 "As far as I know, absolutely did not happen.") He further testified about the life insurance policies that Petitioner sold. Raymond Olson testified that he was aware of the policies, but that he does not recall talking with Petitioner about the sale of the policies, and how much money was received on the sale. (Id. at 3154.) He further testified that he did not negotiate a commission to be paid to Petitioner on the sale of the policies. (Id. at 3155.) He denied writing the letter directing that the proceeds from the sale of the Transamerica policy be reacquired from the Olsons' Bear Stearns account, so that Petitioner could direct that the funds be deposited in the Wells Fargo Bank account of Oxford Global Advisors, LLC. (Id. at 3156; Gov't Ex. 286.)

Charlotte Olson's deposition testimony was admitted at trial. She testified that Petitioner did not tell her that he was selling the insurance policies, or that he received almost $ 4 million from the sales. (Tr. XIV at 3389.) She further testified that she never followed through to purchase shares in OPCG. (Id. at 3405.)

During trial, Petitioner had the opportunity to challenge the government's evidence. Petitioner testified on his own behalf over the course of three days during which he provided testimony and documentary evidence to support his claim that the Olsons and Dale Woodbeck purchased shares in the OPCG and that they were aware of such purchase. (Tr. XXI at 5004-5020.) Petitioner also testified about the insurance policies on Raymond Olson's life, that the Olsons were aware of these policies and that they were sold in order to finance the alleged purchase of the Olsons' shares of OPCG, and how the proceeds from the sale of those policies were paid out. (Id. at 5017-5020.)

Petitioner has not demonstrated, however, how the additional evidence identified in his habeas petition would have changed the outcome of the proceedings, in light of the substantial evidence presented at trial to show that Petitioner did steal money from the Quiggle Trust and the Olson Trust, including the testimony of Raymond and Charlotte Olson. The record also includes evidence that Petitioner previously testified in a related civil action brought by victims of the currency fraud scheme, that certain funds, later determined to be proceeds from the Olson life insurance policies, were Petitioner's earnings. (Gov't Ex. 565 (Hrg Tr.; Ex. 5).) Later, in the related SEC action, Petitioner changed his

testimony concerning these funds, claiming they were his commissions from the sale of the insurance policies, and payment for the Olsons' alleged purchase of shares in OPCG.

This evidence, together with the overwhelming evidence concerning Petitioner's knowledge of the fraud, his fraud upon the NHL and his lies about his experience, substantially support the jury's verdict. Accordingly, the Court finds that Petitioner has failed to demonstrate he is entitled to relief based on the argument that additional evidence should have been introduced at trial.

### 4. Ground 4 - Failure to Investigate Witnesses to Provide Exculpatory Evidence

Petitioner argues that counsel was ineffective for failing to call a number of witnesses who could have provided exculpatory evidence. For example, Petitioner argues that Eric Erickson was the Chief Compliance officer for PCG during 2005-2008 and that he visited Crown Forex in Switzerland in early 2008. Petitioner asserts that Erickson would have testified that he did not see any irregularities or express any concerns regarding the organization of Crown Forex or the representatives that he met. Petitioner asserts Erickson's information would have provided additional support for his defense.

The Court is mindful that decisions relating to witness selection are normally left to counsel's judgment, and 'this judgment will not be second-guessed by hindsight.'" <u>Fretwell v. Norris</u>, 133 F.3d 621, 627 (8th Cir. 1998) (quoting <u>Williams v. Armontrout</u>, 912 F.2d 924, 934 (8th Cir. 1990) (en banc) <u>cert. denied</u>, 498 U.S. 1127 (1991)).  Moreover, given the vast amount of evidence presented at trial to show that Crown Forex S.A. was not sound, and that millions of investor funds deposited with Crown Forex S.A. disappeared, Petitioner cannot meet his burden of demonstrating that Erickson's testimony would have changed the outcome of the trial.

The same can be said for the remaining witnesses listed in Petitioner's Memorandum in Support of his Petition.  It does not appear that any of these witnesses could provide testimony that would cast a shadow on the government's case that Petitioner was knowingly involved in a Ponzi scheme that robbed investors of more than $100 million, that Petitioner committed fraud by submitting false financial information to the NHL, and that Petitioner defrauded the Quiggle Trust and the Olsons of millions of dollars.  Counsel's decision not to call these witnesses during the defense case-in-chief was clearly a strategic decision that, based on this record, should not be second-guessed.

5. **Ground 5 - Failure to Submit Evidence as to Petitioner's Lack of Knowledge of Activities and Entities Associated with the Charged Fraud.**

Petitioner asserts that counsel was ineffective for failing to introduce evidence at trial regarding Petitioner's lack of knowledge of the activities conducted by co-conspirators, and failing to introduce evidence to show ownership interest, oversight and control of the activities of co-conspirators. He further argues that counsel failed to take steps to impeach co-conspirator Christopher Pettengill. For example, Petitioner argues counsel should have introduced evidence as to why OPCG moved offices to the Van Dusen mansion, and how the name "Oxford" was used by Pettengill, in order to show that Petitioner wasn't involved in the entities run by Pettengill or Trevor Cook and was not aware of the fraud scheme they were carrying out.

Even if such evidence had been admitted at trial, the fact remains that the government submitted overwhelming evidence that by the summer of 2008, Petitioner was advised, on multiple occasions, that the currency program was illegal, and that despite such advice, Petitioner continued promoting the currency program and investing funds in the program.

At trial, the government called as witnesses attorneys Kari Berman and

17

Robert Mendelson, who both testified they met with Petitioner, Durand and Pettengill at the Van Dusen mansion in June 2008 and that during this meeting, they advised Petitioner that the currency program was illegal and that a rescission offer should be made to the investors. (Tr. XVI at 3797-98; Tr. XVI at 3866.)

Martin Klotz, who was retained as counsel for Oxford Global Advisors in July 2008, also testified at trial that after reviewing materials about the currency program, and after meeting with Petitioner, he believed the currency program made no sense, and that such program had been marketed in violation of the United States securities laws, and that he told Petitioner to discontinue the program and to give the investors their money back. (Tr. IX at 2053, 2056.) Klotz also testified that after meeting with Trevor Cook in August 2008, he and Berman met with Petitioner and advised him that Cook is a crook, and that he's likely running a Ponzi scheme. (Id. at 2071.)

Despite this clear advice as to the illegality of the currency program and that investors should be given their money back, the government also presented evidence that Petitioner did not cut ties with Cook and that he did not return all the money to investors, but instead continued to obtain new investor funds for the currency program. The government also presented evidence that Petitioner

transferred more than $6 million to himself from the Crown Forex LLC account during the period of July 2008 through March 2009. (Gov't Ex. 368 at 2.)

Accordingly, Petitioner has not demonstrated that had counsel moved to admit additional evidence as to Petitioner's lack of knowledge of the currency fraud scheme, the outcome of the proceeding would be different.

### 6.    Ground 6 - Failure to Call Attorney Witnesses

Petitioner argues that counsel was ineffective for failing to call as witnesses attorneys that were intricately involved in the vetting and dispensation of advice to Petitioner. Petitioner has not provided any indication of what their actual testimony would have been, and how such testimony would have affected the outcome of the trial. Accordingly, the Court finds he has failed to demonstrate that had the identified attorneys been called as witnesses on his behalf, the outcome of the trial would have been different.

### 7.    Ground 7 - Failure to Move for Severance

Petitioner further argues that counsel was ineffective for failing to move for severance, because failure to sever allowed for prejudicial evidence as to his co-defendants to be presented at his trial. Again, Petitioner has failed to demonstrate prejudice.

Generally, severance is not warranted when codefendants are charged with conspiracy. In this case, Petitioner, Durand and Kiley were charged with conspiracy to commit mail and wire fraud. The law clearly favors joint trials in conspiracy cases. See e.g., United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996) (affirming joinder of defendants in drug conspiracy case). Similarly, the law favors joinder of charges if they are the same or similar character or based on the same act or transaction. United States v. Midkiff, 641 F.3d 431 (8th Cir. 2010) (affirming joinder of tax charges and fraud charges). Here, joinder of defendants and charges was proper given the fact that Petitioner and his co-defendants were involved in the operation of the fraudulent currency program, and that the charges arose from the same transaction or are connected to a common scheme or plan.

> Severance may be warranted
>
> only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.

Zafiro v. United States, 506 U.S. 534, 539 (1993). "The burden of showing a clear

likelihood of prejudice falls on the party seeking severance." <u>United States v. Hively</u>, 437 F.3d 752, 765 (8th Cir. 2006). Petitioner has not made such a showing, therefore his claim of ineffective assistance of counsel based on such argument is without merit.

        **8.**    **Ground 9 - Failure to Defend Against Reasonable Forseeability Instruction**

    Petitioner argues that counsel was negligent in failing to submit evidence at trial as to the sequence of events leading to the use of an internet based platform for the Crown Forex account. Petitioner does not, however, demonstrate how the introduction of such evidence would have changed the outcome of the proceedings. Petitioner also suggests that "reasonable forseeability" introduces unacceptable degrees of unpredictability, and that his counsel did not present such an argument to the jury.

    As discussed above, substantial evidence was presented at trial to show that Petitioner was made aware - in no uncertain terms - that the currency program was illegal by August 2008. Petitioner claims that the sequence of events was not properly presented to the jury, but fails to explain why this would affect the outcome of the case. Petitioner has thus failed to demonstrate prejudice.

### 9.    Ground 10 - Counsel Presented Argument and Evidence Implicating Petitioner

Petitioner argues that during closing statements, his counsel used terms such as "stool pigeon", "fink" or "rat" to describe Chris Pettengill - terms that are associated with organized crime.  Petitioner further asserts during his closing statement, counsel stated "just because you act like a conspirator doesn't mean you are a conspirator."  Petitioner argues that as a result of these comments, counsel created an image for the jury that Petitioner was somehow connected to a criminal organization.

As is evident from the transcript of counsel's closing statement, the defense strategy used was to cast Pettengill as the "real villain" in this case, therefore referring to him as a "stool pigeon" or "fink" is completely consistent with this strategy.  (Tr. XXVI at 6030.)  It is also evident that the defense strategy involved distancing Petitioner from Pettengill and Cook as much as possible, and to argue to the jury that Petitioner did not know or have reason to know the currency program was false.  The strategy did not work, not because counsel referred to Pettengill as a "stool pigeon" but because the evidence overwhelmingly demonstrated that Petitioner knowingly participated in the currency fraud

scheme, as well as the fraud against the NHL and against the Olson family.

Accordingly, this claim is without merit.

### 10.    Ground 11 - Counsel was Ineffective in Addressing Character Evidence

Petitioner argues that counsel did not effectively defend against negative

character evidence - that was over twenty years old - presented by the

government.  He argues that counsel had available a significant amount of

positive character evidence, but that counsel failed to introduce such evidence at

trial.

Petitioner has not presented any argument to the Court as to what these

additional witnesses would say or demonstrate how this evidence would have

changed the outcome of the proceedings.  Further, Petitioner has made no

demonstration or argument that the character evidence introduced during the

government's case-in-chief was misleading or untrue.  In fact, during cross-

examination, Petitioner admitted that much of the character evidence introduced

by the government was true.  For example, Petitioner conceded that he was asked

to leave the United States Air Force Academy because he was involved in an

incident involving drinking and driving, and that he lied to the school about his

involvement.  (Tr. XXIII at 5347.)  Petitioner further admitted that he forged his

mother's signature on student loan application forms.  (Id. at 5351.)  He also

admitted to buying a car from an individual in Canada, and then selling the car

and keeping the proceeds even though he had not fully paid for the car.  (Id. at

5354-55.)  Petitioner further admitted that as the personal representative of his

grandfather's estate, he mortgaged his grandfather's home, and used the proceeds

to pay off personal debts.  (Id. at 5387-90.)  When the beneficiaries of his

grandfather's estate sued him - his mother and his aunts - the settlement proceeds

came from accounts held in the name of the currency investment entities, such as

UBS Diversified Growth, LLC and Crown Forex.  (Id. at 5391, 5393.)  Accordingly,

the Court finds Petitioner has not demonstrated prejudice by the failure to

introduce additional positive character evidence.

### 11.    Ground 12 - Tax Counts

Petitioner next argues that counsel was ineffective in presenting a defense

against the tax counts by negligently withholding exculpatory evidence as to

those counts.  Petitioner claims that counsel had little or no tax experience and

that he failed to confer with tax experts to create a defense.  He further asserts that

government witness Anne Johnson testified that Petitioner owed approximately

$165,204 in taxes for the year 2007, and that counsel did not challenge this evidence with evidence showing that by September 2008, Petitioner had paid in excess of $350,000 in state and federal taxes.

Petitioner was charged with filing a false individual tax return for the taxable year 2007, tax evasion for the taxable year 2008, and filing a false tax return for the taxable year 2009. Petitioner has failed to demonstrate how evidence that he paid additional federal and state taxes in 2008 for the taxable year 2007 is a defense to filing a false tax return for 2007. Accordingly, Petitioner has not established that he is entitled to any relief on the tax counts.

### 12. Ground 13 - Failure to Obtain and Submit Exculpatory Evidence

Petitioner argues that counsel was also ineffective by failing to introduce at trial evidence of the successful efforts by Petitioner and attorneys from the Greene Espel law firm to recover investor assets and to create a point of reference for information until the appointment of a Receiver. Petitioner asserts that attorney Andrew Luger spearheaded these efforts and was privy to confidential information, yet counsel failed to introduce such evidence at trial. Petitioner further asserts that counsel did not undertake to meet with Luger nor engage in a

conversation about what Luger knew.

A review of counsel's billing records demonstrates that counsel did speak with Luger prior to trial.  In fact, the billing records indicate that counsel spoke with Luger on four occasions: July 22, 2011 conference with Luger regarding the SEC investigation, August 5, 2011 conference with Luger about the SEC investigation; March 9, 2012 conference with Luger regarding possible witness role; and May 1, 2012 conference with Luger and an AUSA about possible testimony.  (Gov't Exs. B, F and G.)

This Court also issued an Order dated May 22, 2012 directing Petitioner to choose between calling Luger as a witness and waiving the attorney-client privilege or not calling Luger as a witness. [Doc. No. 281] Based on these circumstances, counsel for Petitioner clearly made a strategic decision not to call Luger as a witness.  United States v. Orr, 636 F.3d 944, 952 (8th Cir. 2011) (strategic decisions virtually unchallengeable).

### B.      Ground 14 - Role Reduction

Separate from his ineffective assistance of counsel claims, Petitioner further asserts the Court should consider whether he is entitled to a reduction for minor role pursuant to Amendment 794 to the United States Sentencing Guidelines,

which became effective November 1, 2015.

Petitioner was sentenced on January 3, 2013. Amendment 794 was not in effect at that time, and cannot now be the basis for a claim in this § 2255 petition. See, e.g., Burke v. United States, 152 F.3d 1329, 1332 (11th Cir. 1998) ("[A] claim that the sentence imposed is contrary to a post-sentencing clarifying amendment is a non-constitutional issue that does not provide a basis for collateral relief in the absence of a complete miscarriage of justice.")

Even if Amendment 794 could be applied retroactively to Petitioner's sentence, the evidence at trial would not support a minor role reduction for Petitioner.

## V.    Motion to Appoint Counsel

The standard for appointment of counsel in this case is whether the Petitioner and the Court would benefit from the assistance of counsel. Nachtigall v. Class, 48 F.3d 1076, 1081 (8th Cir. 1995). "Factors bearing on this determination include: the factual complexity of the issues; the ability of an indigent to investigate the facts; the existence of conflicting testimony; the ability  of an indigent to present his claim; and the complexity of the legal issues." Id. at 1081-82.

Based on its review of the record and the submissions of the parties, the Court concludes that neither the facts nor the legal issues in this case are so complex that counsel should be appointed. The Court can resolve Petitioner's claims based on the pre-existing record. Appointment of counsel would benefit neither Petitioner nor the Court. Petitioner's motion for appointment of counsel is denied.

## VI.    Certificate of Appealability

With regard to the procedural rulings in this Order, the Court concludes that no "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right;" nor would "jurists of reason . . . find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). With regard to the decision on the merits, the Court concludes that no "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Id.

Accordingly,

**IT IS HEREBY ORDERED** that the Petition to Vacate, Set Aside or Correct a Sentence Pursuant to 28 U.S.C. § 2255 [Doc. No. 571] is **DENIED**, the Motion for

Appointment of Counsel [Doc. No. 575] is **DENIED,** and the Court denies a

Certificate of Appealability in this case.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Date:   February 28, 2018

s/ Michael J. Davis
Michael J. Davis
United States District Court